1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LAWRENCE PEPE CARDOZA,              No.  2:12-cv-0171 CKD P

12              Petitioner,

13        v.                             ORDER AND
                                         FINDINGS & RECOMMENDATIONS
14   CONNIE GIPSON, Warden, CSP-
     Corcoran,
15
                Respondent.
16

17

18        Petitioner is a California prisoner represented by counsel who filed a petition for writ of

19   habeas corpus under 28 U.S.C. § 2254.  He is serving a sentence of 18-years-and-4-months

20   imprisonment following convictions in Sacramento County for various charges arising from a

21   high-speed police chase including: assault with a deadly weapon on a peace officer, operating a

22   motor vehicle with intent to evade a pursuing peace officer, and flight from a pursuing peace

23   officer by driving in the opposite direction of traffic.  Petitioner challenges his conviction and

24   sentence arguing his defense lawyer failed to call or consult an expert in bullet trajectory analysis

25   at trial in violation of his constitutional right to effective assistance of counsel.  Petitioner also

26   claims his trial was fundamentally unfair because the trial court erroneously admitted evidence of

27   his two prior convictions for similar high-speed car chases.  For the reasons that follow, the

28
                                         1

1  undersigned will recommend that petitioner's application for federal habeas relief be denied.

2  I.  Background[1]

3     Petitioner is apparently no stranger to high-speed car chases.  He has been convicted for

4  three separate incidents of evading law enforcement at high speeds.  The first such incident

5  occurred in Vallejo in January 2002.  A Vallejo police officer spotted petitioner driving a Dodge

6  Caravan without a front license plate, and attempted to pull him over.  After seeing the police

7  lights of the marked patrol car, petitioner veered into a parking lot, exited the lot, and accelerated

8  down the street at speeds exceeding 60 miles per hour, in a 35 zone.  After an extensive chase, the

9  police officer pulled next to the Caravan and turned into it, forcing the car into a curb thereby

10  breaking its axle.  Petitioner took off on foot, and was soon apprehended hiding underneath a

11  parked truck nearby.

12     The second incident occurred in Sacramento in September 2004.  A police officer in a

13  marked patrol car attempted to pull petitioner over in a Ford Mustang.  Instead, petitioner sped

14  away at speeds exceeding 50 miles per hour in a 25 zone until he crashed into a guywire of a

15  telephone pole.  The Mustang ended up leaning against the metal wire, which anchored the pole

16  to the ground, the front of the car facing upward at a 35-to-40 degree angle.  Petitioner again fled

17  on foot until he was apprehended by police.

18     Petitioner is currently serving a sentence arising from his third high-speed car chase, and it

19  is this conviction and sentence that he challenges in his pending petition for habeas relief.

20  California Highway Patrol ("CHP") officers Sarabia and Hawkinson were driving together in a

21  patrol car in Sacramento County, when they spotted petitioner weaving through several lanes of

22  traffic during the early morning of December 8, 2007.  Suspecting that he was driving

23  intoxicated, they pulled him over.  When Officer Sarabia walked toward petitioner's car,

24  petitioner drove off.  The CHP officers pursued petitioner driving at high speeds through a

25  residential neighborhood.  During the ensuing chase, petitioner took a turn too quickly and ended

26

27  [1] The following background is drawn from the Court of Appeal's unpublished opinion in People
    v. Cardoza, No. C061213, WL 2010 WL 1367602 (Cal. Ct. App. Apr. 7, 2010) (unpublished)
28  unless otherwise noted.

1    up on the driveway of a residence.  The CHP officers caught up with him there.

2           Shots were fired in the driveway that morning, and the specific facts of what precisely

3    occurred in that driveway were hotly contested at trial; this issue concerns petitioner's pending

4    application for habeas relief.  The details of the trial testimony on this issue will be discussed

5    further below, but the following facts were essentially uncontested.  Officer Sarabia drove the

6    CHP patrol car onto the driveway and pushed his car's bumper up against petitioner's car,

7    thinking he could keep petitioner from getting out and running away.  Meanwhile, Officer

8    Hawkinson got out of the patrol car and approached the vehicle with his gun drawn.

9           Before Officer Sarabia could exit his vehicle as well, petitioner started driving forward

10   and backward in an apparent attempt to escape.  He hit the patrol car at least twice while both

11   officers called out for him to stop the car.  At this point, Officer Hawkinson, already outside the

12   car, had walked across the right side of the driveway into a dark area.  When Hawkinson made

13   eye contact with petitioner, petitioner immediately drove his car towards the street and in the

14   general direction of Officer Hawkinson.  Hawkinson then made a move toward his patrol car,

15   crossing the path of petitioner's car.

16          Importantly for the ineffective-assistance-of-counsel claim discussed below, Officer

17   Hawkinson then fired two shots into petitioner's car.  One bullet went through the passenger

18   window just above the side-view mirror and exited the car near the left–rear wheel well.  The

19   other bullet struck petitioner in the buttocks.  Officer Hawkinson testified at trial that he fired the

20   shot because he believed his life was in danger.  The dispute at trial focused on whether Officer

21   Hawkinson was standing in the path of petitioner's car when he fired the shots such that he fired

22   lawfully, as will be discussed *supra* at subpart I.A.

23          Petitioner eventually maneuvered his car past the patrol car and out of the driveway.  The

24   CHP officers pursued him in their patrol car and notified the dispatcher that shots had been fired.

25   Petitioner drove through the residential neighborhood driving erratically at high speeds.  He hit a

26   Ford pickup truck, damaging a tree and landing on the lawn in front of a residence.  He then

27   accelerated onto the main street.  He proceeded east driving the wrong direction in the westbound

28   traffic lane, and then got onto to State Route 99 by driving up the wrong direction of an off-ramp.

1  (Rep.'s Tr. on Appeal ("R.T.") 231-32, ECF No. 26.)  He drove the wrong way on the highway

2  until he made a U-turn.  (R.T. 232.)

3      The CHP officers caught up to petitioner when his car was stopped facing the wrong

4  direction on State Route 99 after a traffic collision with another car.  (R.T. 236.)  Officer Sarabia

5  drove his patrol car in nose-to-nose position with petitioner's car.  (R.T. 237.)  Although

6  petitioner's car was stopped, apparently disabled, the engine continued to rev "up and down" as if

7  petitioner "was trying to accelerate."  (R.T. 237:19-238:11.)  Petitioner was taken into custody at

8  this point, and a blood test revealed alcohol in his system below the legal limit, as well as the

9  presence of cocaine and morphine.

10      A.  The Trial

11      The Sacramento County District Attorney charged petitioner with assault of a police

12  officer with a deadly weapon, Cal. Penal Code § 245(c); operating a motor vehicle with the intent

13  to evade a pursuing police officer, Cal. Veh. Code § 2800.2(a); flight from pursuing peace officer

14  by driving in the wrong direction, Cal. Veh. Code § 2800.4; misdemeanor hit and run, Cal. Veh.

15  Code § 20002; and driving under the influence of an alcoholic beverage or drug, Cal. Veh. Code

16  § 23152(a).  Petitioner pled "not guilty" to all counts, and the jury found him guilty on all

17  charges.[2]  He was sentenced to imprisonment for 18 years and 4 months.  Petitioner's conviction

18  on count one—assault with a deadly weapon on a police officer—resulted in 17 years of his 18-

19  years-4-months prison sentence due to a prior "strike" offense, doubling the 5-year sentence, and

20  an enhancement of seven years.

21       In light of the of the potential length of the imprisonment penalty associated with a

22  conviction on count one, petitioner's defense lawyer focused her defense on this count.  Thus, the

23  critical issue for the defense's case was where Officer Hawkinson stood when he fired the two

24  gunshots: if he was not close to or in the path of petitioner's car, then he was not in danger and

25  thus fired unlawfully,[3] so petitioner would avoid conviction on count one.  Both sides brought in

26  _____

   [2] Petitioner's initial trial resulted in a mistrial.

27  [3] One essential element in the jury's charge on count one was that the government must prove that
   "when the defendant acted, the person assaulted was lawfully performing his duties as a peace

28  officer."  (R.T. 842:2-17.)  The judge instructed: "A peace officer is not lawfully performing his

4

experts to testify about Officer Hawkinson's location when he fired the two gunshots, extrapolated from the physical evidence.  In his habeas petition, petitioner contends his counsel at trial was ineffective in this regard, as elaborated below.

      1.  Expert Testimony Regarding CHP Officer Hawkinson's Location

      Petitioner contends his attorney rendered deficient performance by failing to hire a "ballistics" expert to consult with in investigating petitioner's case, and to testify in petitioner's defense at trial.  Specifically, petitioner argues a ballistics expert's consultation was essential to the effectiveness of the defense attorney's cross-examination of the government's ballistics expert; further, petitioner contends the defense needed its own ballistic expert's testimony to rebut the government's expert.

      In the prosecution's case in chief, the government called Sergeant Robert Snook, who was qualified as an expert in "trajectory analysis," "accident reconstruction," and "the investigation of officer-involved shootings"—including "[w]here [a particular] bullet originated [from, and] what path it took to arrive at its destination," (R.T. 336-37), an issue petitioner contends was vital to his defense.  Perhaps in light of Snook's extensive experience in these fields, defense counsel declined to object to his qualification as an expert in these fields or to take him on voir dire.  (R.T. 337.)

      Sergeant Snook testified on direct examination about what happened in the driveway December 8, 2007, and offered his expert opinion about the position from which the shots were fired.  Snook testified that he and his team of analysts examined the physical evidence, and opined that this evidence showed that petitioner's car indeed moved back and forth, striking the patrol car.  He testified that after several strikes of the patrol car, petitioner's car was perpendicular to the driveway and the patrol car, and was facing the right side of the driveway. (R.T. 373.)  The petitioner's car then turned sharply to the right to drive out of the driveway. Moreover, the car accelerated so fast it caused "the wheels to slip and . . . the skid marks that [were admitted] as evidence items number 26 and 28."  (R.T. 373:22-26.)   Based on this physical

---

or her duties if he or she is . . . using unreasonable or excessive force in his or her duties."  (R.T. 843:17-22.)

1   evidence as well as the location of the bullet shell casings, Snook "concluded" that "the

2   statements" of Officers Sarabia and Hawkinson—that Hawkinson fired from the line of danger of

3   petitioner's car—"match" the physical evidence "a hundred percent."  (R.T. 476:9-17.)

4   Ultimately, in response to the prosecutor's question, "based on all the evidence that you have

5   reviewed in this case . . . , does the evidence . . . support Officer Hawkinson's testimony that he in

6   fact was in the line of danger from the fleeing vehicle at the time he shot his duty weapon,"

7   Sergeant Snook answered, "Absolutely, yes."  (R.T. 401:8-17.)

8          Defense counsel elected to cross-examine Sergeant Snook.  Petitioner contends defense

9   counsel's cross-examination suffered for lack of the defense's own ballistics expert.  Specifically,

10  petitioner points out that defense counsel never mentioned the significance of the location of the

11  bullet shell casings, which the record reflects.  (See R.T. 421-48.)

12         However, respondent contends defense counsel's cross-examination reflected an

13  understanding of the ballistics evidence, and that defense counsel focused her cross-examination

14  on pointing out inconsistencies and weaknesses in the evidence.  Specifically, defense counsel

15  cross-examined Sergeant Snook on the bullet trajectories: "[A]ssuming a bullet travels in a

16  straight line, what . . . can we assume about the first shot that Officer Hawkinson fired?"  (R.T.

17  442:17-19.)  Moreover, defense counsel was able to get Sergeant Snook to admit that, based on

18  the physical evidence alone without considering the CHP officers' statements, Snook could not

19  know the exact spot where Officer Hawkinson was standing:

20         Q   . . . [Y]ou don't know exactly where he was standing, do you?

21         A   The exact spot, I do not.

22  (R.T. 429:20-24.)

23         In turn, Snook was forced to admit on cross his conclusion was based in part on the CHP

24  officers' statements:

25         Q   . . . [I]n your report, part of your assessment was that
               Officer Sarabia's vehicle . . . backed . . . out of the driveway
26             and continued after [petitioner].

27         A   Yes.

28         Q   . . . [T]here is no physical evidence for that, correct?

1      A      Correct.

2      Q      So you relied on his statement.

3      A      His statement in conjunction with the absence of physical
              evidence, yes.

4

5    (R.T. 428:21-428:8.)  Further, defense counsel's common-sense approach was reflected in her

6    closing jury argument:

7              We don't need a bunch of experts up her to tell us a bullet travels in
               a straight line. . . .

8
               The line of that first shot cannot put Officer Hawkinson
9      where he places himself.  It can't.  A bullet travels in a straight line.
       He could not be where he places himself and nobody reaches way
10     over to the side to shoot.  Common sense.

11   (R.T. 913:24-914:12.)

12          The defense did not call a ballistics expert to testify, but defense counsel did consult with

13   an accident-reconstruction expert, Laurence Neuman.  As petitioner points out, the defense's

14   expert relied on the CHP's information; however, he did so, as defense counsel explained to the

15   trial court, "because . . . to do [an accident reconstruction] from scratch [wa]s not going to be

16   nearly as accurate as the [information gathered] right after the accident happened."  (Rep.'s

17   Augmented Trs. on Appeal 4:27-5:3.)

18          Moreover, the defense called Laurence Neuman to testify as an accident-reconstruction

19   expert witness, and he was qualified to testify as an expert in this capacity.  (R.T. 710:11-21,

20   713:24-26, 715:8-9.)  Neuman is a civil engineer who works in the field of accident

21   reconstruction, and he possessed at the time a bachelor's degree in civil engineering and a

22   master's degree in civil engineering with an emphasis in traffic engineering.  (R.T. 710:28-

23   711:22.)

24          The trial court admitted—over the government's objection—Neuman's expert opinion on

25   direct examination from defense counsel that Officer Hawkinson was not standing in the line of

26   danger when he fired his gun:

27             Q      . . . Mr. Neuman, do you have an opinion as to whether or
                      not Officer Hawkinson was standing in front of the vehicle
28                    when that first shot was fired?

                                              7

1          A          Yes, I have an opinion.

2          Q          And what would that opinion be?

3          A          The opinion is that he could not have been.

4          . . . .

5          Q          Now, in your opinion, based on the physical evidence, was
                      Officer Hawkinson at any point in front of the vehicle when
6                     he fired either shot?

7          A          No.   The shots, I would agree, based on the angles [in a
                      diagram of the scene used as a demonstrative exhibit], are
8                     something like this.   And if that's where Officer Hawkinson
                      is located, then he's not in front of the vehicle obviously.

9
           Q          Now, in your opinion, if that vehicle continues on a straight
10                    path consistent with the skid marks that both you and
                      Sergeant  Snook  agree  are  [petitioner's]  exiting,  is
11                    [Hawkinson] ever at a point where he's going to be hit by
                      that vehicle?

12
           A          From the point kind of where I've drawn forward, no.
13

14     (R.T. 723:28-728:25 (emphasis added).)

15          On cross-examination, however, Neuman was forced to admit that he was not qualified to

16     perform bullet trajectory analysis:

17         Q          . . . . [Y]ou stated you didn't do a bullet trajectory [analysis]
                      here; is that correct?
18
           A          Right.
19
           . . . .
20
           Q          [W]hen I asked you out in the hallway whether or not there
21                    was any new information with respect to your report and
                      you told me no, did that also include the fact that you had
22                    just performed a trajectory analysis with respect to where
                      the officer was positioned?
23
           A          No.   What you asked me in the hallway was what was my
24                    opinion, and I said basically I agree with Officer Snook's.
                      I'm not really qualified to do much trajectory analysis.  I'm
25                    willing to say a bullet's going to go in a straight line and
                      thus has to have an angle.   But in terms of how close
26                    someone was standing to the car, that's not really my
                      expertise.
27

28     (R.T. 743:5-25 (emphasis added).)

2.   Admission of Petitioner's Prior Evasion Convictions

Petitioner contends the trial court erred by admitting testimony about his prior convictions for similar high-speed car chases, and that the admission of this testimony rendered his trial fundamentally unfair.

In the prosecution's case in chief, they called Sergeant John Miller of the Vallejo Police Department.  Sergeant Miller testified in great detail about petitioner's first high-speed car chase in Vallejo in 2002.  (R.T. 542:4- 552:10.)  The prosecution also called Officer Ret Townsend, retired, formerly of Sacramento Police Department, and, at the time of the trial, a reserve officer for the Sacramento Police Department and the Sacramento County Sheriff's Department.  (R.T. 583:8-584:12.)  Officer Townsend testified in great detail about petitioner's second high-speed car chase in Sacramento in 2004.  (R.T. 584:22-589:12.)  The defense objected to the introduction of this evidence by motion in limine and at trial through a continuing objection, the motion in limine being denied, the objection being overruled, and a continuing objection noted.  (See R.T. 536:25-537:6.)

The trial court addressed the admissibility of these prior crimes before trial during motions in limine.  Petitioner moved to exclude these prior crimes, countering the prosecution's argument that due to the similarity of the prior car-chase-related crimes with the conduct at issue in the trial, this evidence was admissible to show a motive to evade law enforcement.  Petitioner argued:

> [T]he intent to evade the officer here [is] conceded.  No problem.  It is not a disputed fact.  We concede, that, yes, Mr. Cardoza, on December 8th, was evading officers.  He drove too fast.  He did all the things that an evading is.  He did all the things that an evading always has. . . .
>
> Just like 2002, 200[4] he evaded the officers. . . .
>
> [T]he fact that [petitioner] has two prior[s] . . . shows nothing to a jury other that he's a bad guy when we're conceding the [evasion] charge here.

(R.T. 29:16-30:23.)  The trial court disagreed and overruled the objection.

The trial court reasoned that these prior crimes were relevant and admissible to prove petitioner's motive to harm law enforcement.  The court reasoned the prior crimes—in which, in evading police, petitioner slammed his car into the law enforcement car—make it "more likely

9

1   that the driving events that occurred in that driveway in fact occurred the way the officer testified

2   that they did and less likely that they didn't," i.e., that Officer Hawkinson was in the line of

3   danger of petitioner's car and therefore lawfully fired at petitioner.  (R.T. 33:13-28.)  The trial

4   court applied California Evidence Code § 1101 which prohibits the admission of "evidence of a

5   person's character . . . when offered to prove his or her conduct on a specific occasion," unless

6   "relevant to prove . . . motive, opportunity, intent, preparation, [or] plan."

7       The court held "with respect to motive, [and] with respect to planned scheme and intent,

8   this evidence appears to the court properly admitted."  R.T 36:13-22.  In reaching this ruling, the

9   trial court relied extensively on the California Supreme Court's opinion in <u>People v. Ewoldt</u>, 7

10  Cal. 4th 380 (1994), in which the court held that a defendant stepfather's prior molestation of the

11  victim's older sister in the family home was admissible in the trial of the stepfather for

12  molestation of the younger sister victim under the "common design or plan" exception.  <u>Id.</u> at

13  403.  The trial court also admitted evidence of petitioner's parolee status to show motive to evade

14  arrest.  (R.T. 682-85.)  The testimony concerning petitioner's prior crimes and parolee status was

15  accompanied by appropriate limiting instructions from the trial court to the jury designed to cure

16  the risk of unfair prejudice.

17      B.  <u>Court of Appeal's Opinion</u>

18      On direct appeal of petitioner's conviction, the California Court of Appeal for the Third

19  District affirmed petitioner's conviction in an unpublished opinion, holding *inter alia* the trial

20  court did not abuse its discretion in admitting petitioner's prior high-speed car chase convictions.

21  <u>People v. Cardoza</u>, No. C061213, 2010 WL 1367602 (Cal. Ct. App. Apr. 7, 2010) (unpublished).

22  However, because "as even the People concede, there was no nexus or direct link between the

23  prior acts and the current crimes," the court held the "commission of the prior flight offenses did

24  not provide incentive for defendant to commit the current crimes."  <u>Id.</u>at *14.  Accordingly, the

25  court held the trial court erred by admitting the prior acts under the motive exception to the rule

26  prohibiting propensity evidence.  <u>Id.</u>

27      Nonetheless the court affirmed, finding this particular error to be harmless, because "the

28  evidence of the prior acts was admissible" under the common scheme or plan exception to the

1   rule prohibiting propensity evidence.  Id.  This particular portion of the Court of Appeal's

2   decision is important to decision on the pending petition for habeas relief, since it represents the

3   last reasoned decision and is the asserted basis for petitioner's due process claim for habeas relief.

4   　　　The appellate court held that "there was no abuse of discretion in admitting the prior acts

5   to show common scheme or plan for assault with a deadly weapon and intent and common

6   scheme or plan for evading a police officer and driving against the proper direction of traffic

7   . . . ." Id. at *8.  The court reasoned that the "two prior acts were extremely similar to the current

8   acts and they were not unduly prejudicial," because the charged acts and the prior acts all

9   "involved defendant violating the law (weaving in and out of lanes of traffic), speeding away

10  from police officers who were lawfully trying to detain him . . . , driving 50 to 60 miles per hour

11  through a 25 . . . zone, . . . using his car offensively to try to hit one of the officers, . . . and

12  refusing to submit to officers when caught." Id. at *8-9.

13  　　　The court noted and distinguished a case with analogous facts:

14  　　　　　In Scheer, the defendant stood trial for felony hit and run
　　　　　　and vehicular manslaughter, and the prosecutor introduced evidence
15　　　　　of the defendant's prior acts of fleeing from police.  The Second
　　　　　　District Court of Appeal found the prior flight evidence
16　　　　　inadmissible to prove a common scheme or plan, explaining as
　　　　　　follows: "Although the prior flight offense and charged crime were
17　　　　　committed in a similar manner, i.e., appellant drove through
　　　　　　residential areas recklessly with flagrant disregard for the safety of
18　　　　　others, and shared the same general purpose of avoiding capture
　　　　　　and accountability for his misdeeds, such characteristics are
19　　　　　insufficiently probative to constitute evidence of a common plan or
　　　　　　design.  Instead, the only reasonable inference is that the prior flight
20　　　　　and the charged crime were spontaneous events . . . .  Neither flight
　　　　　　was a planned event.  Instead, each was a spur-of-the-moment
21　　　　　response to an unexpected event . . . ."

22  Id. at *9-10 (emphasis added) (citations omitted) (quoting People v. Scheer, 68 Cal. App. 4th

23  1009, 1014, 1021 (2009)).  However, the court distinguished Scheer: "Regardless of the merits of

24  Scheer, it was a reasonable inference in this case that the prior acts and the charged crimes were

25  not a series of spontaneous acts but ones committed in a 'markedly similar manner,' evidencing a

26  common scheme or plan." Id. at *10 (emphasis in original) (quoting Ewoldt, 7 Cal. 4th at 394

27  ////

28  ////

n.2).  The court explained:

> One or both prior acts shared the following with the current crimes: defendant fled from police when they were lawfully trying to detain him, he led them on a high-speed chase through residential or business neighborhoods, he disregarded road signs and signals, used his car offensively against police when they used their patrol cars to try to pin in defendant's car, crashed into inanimate objects, and refused to submit to the police when caught.

Id. at *10.  Thus, even though the trial court erred by admitting the prior acts to show motive, the court held that there was "no prejudicial error or constitutional violation," id. at *14-15, since the prior acts were admissible under the common scheme or plan exception.

Moreover, the appeals court rejected petitioner's argument that the trial court erred by admitting testimony on petitioner's parolee status to show motive to evade the police, id. at *13, and petitioner's asserted grounds for ineffective assistance of counsel at trial, id. at *15-18.[4]

II.  Standard for Habeas Corpus Relief

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  Also, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)."[5]  It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

---

[4] Since petitioner's asserted grounds for ineffective assistance of counsel on direct appeal are different from his asserted grounds for habeas relief here, the Court of Appeal's decision on this issue need not be recounted here.

[5] Title 28 U.S.C. § 2254(d) establishes a precondition to federal habeas relief, not grounds for entitlement to habeas relief.  Fry v. Pliler, 551 U.S. 112, 119 (2007).

1    The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different.

2    As the Supreme Court has explained:

3        A federal habeas court may issue the writ under the "contrary to"
         clause if the state court applies a rule different from the governing
4        law set forth in our cases, or if it decides a case differently than
         we have done on a set of materially indistinguishable facts.  The
5        court may grant relief under the "unreasonable application" clause
         if the state court correctly identifies the governing legal principle
6        from our decisions but unreasonably applies it to the facts of the
         particular case.  The focus of the latter inquiry is on whether the
7        state court's application of clearly established federal law is
         objectively unreasonable, and we stressed in Williams[ v. Taylor,
8        529 U.S. 362 (2000)] that an unreasonable application is different
         from an incorrect one.
9

10   Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the law

11   set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to

12   cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8 (2002).

13       The court will look to the last reasoned state court decision in determining whether the

14   law applied to a particular claim by the state courts was contrary to the law set forth in the cases

15   of the United States Supreme Court or whether an unreasonable application of such law has

16   occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

17       When a state court rejects a federal claim without addressing the claim, a federal court

18   presumes the claim was adjudicated on the merits, in which case § 2254(d) deference is

19   applicable.  Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013).  This presumption can be

20   rebutted.  Id.

21       It is appropriate to look to lower federal court decisions to determine what law has been

22   "clearly established" by the Supreme Court and the reasonableness of a particular application of

23   that law.  "Clearly established" federal law is that which has been determined by the Supreme

24   Court.  Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004).  At the same time, it is

25   appropriate to look to lower federal court decisions as persuasive authority in determining what

26   law has been "clearly established" and the reasonableness of a particular application of that law.

27   Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th

28

13

1    Cir. 2003), <u>overruled on other grounds by</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63 (2003); <u>cf.</u>

2    <u>Arredondo</u>, 365 F.3d at 782-83 (noting that reliance on Ninth Circuit or other authority outside

3    bounds of Supreme Court precedent is misplaced).

4            Both of the claims presented in this action were presented on direct appeal.  The

5    California Court of Appeal issued a reasoned decision with respect to both of petitioner's claims.

6    The claims were presented to the California Supreme Court via a "petition for review."  Both

7    claims were denied without comment.

8    III. <u>Arguments and Analysis</u>

9        A.  <u>Petitioner's Due Process Claim</u>

10           As discussed above, the trial court admitted testimony concerning petitioner's prior

11   convictions for high-speed car chases under circumstances similar to the charged offense for

12   which he was ultimately convicted.  Petitioner contends the admission of this prejudicial

13   propensity evidence of nominal probative value constituted "an unreasonable application of []

14   clearly established Federal law," 28 U.S.C. § 2254(d)(1), and resulted in a fundamentally unfair

15   trial in violation of constitutional due process.

16           The Fourteenth Amendment prescribes: "No state shall . . . deprive any person of life,

17   liberty, or property, without due process of law."  U.S. CONST. amend XIV, § 1.  As such, no

18   person can be imprisoned as a result of a trial that was fundamentally unfair due to the admission

19   of prejudicial evidence.  <u>United States v. Curtin</u>, 489 F.3d 935, 958 (9th Cir. 2007) (en banc)

20   (reversing and remanding for retrial because the defendant did not "receive[] the due process and

21   fair trial to which he is entitled under our Constitution" (citing <u>Bollenbach v. United States</u> 326

22   U.S. 607, 612 (1946))).  In a federal habeas proceeding, a federal court's "review of evidentiary

23   rulings [in state court] is confined to 'determining whether the admission of evidence rendered

24   the trial so fundamentally unfair as to violate due process.'"  <u>Larson v. Palmateer</u>, 515 F.3d 1057,

25   1066 (9th Cir. 2008) (quoting <u>Windham v. Merkle</u>, 163 F.3d 1092, 1103 (9th Cir. 1998)).

26           Here, in the last reasoned decision, the Court of Appeal held the trial court abused its

27   discretion by admitting petitioner's prior convictions under the "motive" exception; however, the

28   court nonetheless affirmed, finding this error harmless because the evidence was admissible under

1    the "common scheme or plan" exception.  Thus, the crux of petitioner's claim for habeas relief is

2    that the admission of his prior convictions under the "common scheme or plan" exception was

3    clear error resulting in a fundamentally unfair trial.

4         Prior crimes "evidence which bears 'a common scheme, plan, system, or design' is

5    admissible."  United States v. Brashier, 548 F.2d 1315, 1326 (9th Cir. 1976).  However, "[s]uch

6    evidence may not be admitted to show a propensity or proclivity to commit bad acts."  Coursen v.

7    A.H. Robins Co., Inc., 764 F.2d 1329, 1335 (9th Cir. 1985).  For example, "[a] showing of intent

8    to assault on an earlier occasion proves little, if anything, about an intent to assault at some later

9    time."  United States v. Bettencourt, 614 F.2d 214, 217 (9th Cir. 1980) (reasoning "specific intent

10   to assault or impede is not ordinarily transferrable to events two years apart").  As Judge

11   Weinstein observed in his influential treatise:

12
          Mere proof that the defendant previously committed the
13        same type of crime as that with which he or she is now charged is
          not sufficient to justify the introduction of the other crimes
14        evidence . . . .  Defendants cannot be identified as the perpetrators
          of charged acts simply because they have at other times
15        committed the same commonplace variety of criminal act.  Any
          probative value of such evidence relies on the forbidden inference
16        of propensity.

17   JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE MANUAL § 7.01, ¶ 1-7

18   (Joseph M. McLaughlin, ed., Matthew Bender 2011) (emphasis added) (collecting sources).

19        Here, the Court of Appeal erred because the "distinctive" characteristics the trial court and

20   the Court of Appeal found "strikingly similar" are, simply put, present in nearly every high-speed

21   car chase.  Specifically, the Court of Appeal identified the following common facts: "[All three

22   incidents] involved defendant violating the law (weaving in and out of lanes of traffic), speeding

23   away from police officers who were lawfully trying to detain him . . . , driving 50 to 60 miles per

24   hour through a 25 . . . zone, . . . using his car offensively to try to hit one of the officers, . . . and

25   refusing to submit to officers when caught."  Cardoza, 2010 WL 1367602, at *8-9.  The facts

26   underlying petitioner's prior convictions arising from high-speed car chases are not only similar

27   to the charged offense for which he was ultimately convicted, they are "similar to numerous other

28   crimes committed by persons other than the defendant,"  United States v. Powell, 587 F.2d 443,

                                                   15

1   448 (9th Cir. 1978), if not the majority of cases in which a defendant stands accused of using a

2   motor vehicle with the intent to evade a pursuing police officer under Cal. Veh. Code § 2800.2.

3   Compare United States v. Cooks, 589 F.3d 173, 182-83 (5th Cir. 2009) (holding evidence that

4   defendant engineered five fraudulent real estate deals that were substantially similar to those

5   charged in indictment was admissible to show intent, knowledge, motive and plan by

6   "demonstrat[ing] how [an] operation work[s]"), with United States v. Kravchuk, 335 F.3d 1147,

7   1156 (10th Cir. 2003) (reasoning that when both prior acts and charged crimes involved burglary

8   of ATM machines committed by same participants and prior acts occurred only seven months

9   before charged acts, evidence of prior acts was properly admitted under Rule 404(b) to show

10  defendant had developed plan and stable team of participants to burglarize ATM machines).

11      Moreover, the Court of Appeal in this case did not identify and the record reveals no

12  overarching plan linking all three incidents, other than the general motive to escape arrest.  See

13  Cardoza, 2010 WL 1367602, at *6 ("Here, as even the People concede, there was no nexus or

14  direct link between the prior acts and the current crimes.  The commission of the prior flight

15  offenses did not provide incentive for defendant to commit the current crimes." (emphasis

16  added)).  As Judge Weinstein observed, in this case the court admitted testimony concerning

17  petitioner's prior acts under the "common scheme or plan" exception essentially because

18  petitioner "at other times committed the same commonplace variety of criminal act.  Any

19  probative value of such evidence relies on the forbidden inference of propensity."  WEINSTEIN,

20  supra § 7.01.

21      Respondent does not address petitioner's due process argument, but instead argues the

22  court is without the power to grant petitioner the relief he seeks under the Antiterrorism and

23  Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d)(1) (providing for relief only for

24  violations of "clearly established Federal law, as determined by the Supreme Court of the United

25  States").  Specifically, respondent argues the U.S. Supreme Court has expressly declined to reach,

26  let alone decide, the question of whether a state court's admission of prejudicial propensity

27  evidence would constitute a violation of a criminal defendant's due process right to a fair trial.

28  Accordingly, respondent points out that the Ninth Circuit has held that the Supreme Court has not

1   clearly established the law, such that claims such as petitioner's are cognizable in a habeas corpus

2   proceeding.

3      Petitioner concedes the Ninth Circuit has so held, but counters the Ninth Circuit has

4   misinterpreted the Supreme Court's habeas corpus jurisprudence in this regard.  Specifically,

5   petitioner argues the fundamental right to a fair trial under the Fourteenth Amendment is clearly

6   established, and the law prohibiting propensity evidence is historically grounded, such that

7   propensity due process claims, such as petitioner's, are necessarily implied by the general

8   principles articulated by the Supreme Court.  In short, petitioner contends he "'need not produce a

9   "spotted calf" on the precise issue at hand to warrant habeas relief.'"  (Pet. for Writ of Habeas

10  Corpus & Mem. P. & A. by a Person in State Custody ("Habeas Pet.") 20:21-21:15, ECF No. 1

11  (quoting Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002)).)

12     In this case, although petitioner's argument is not without persuasive force, in light of the

13  binding authority identified by respondent, this court is without the power to grant petitioner the

14  relief he seeks.  Indeed, AEDPA requires a constitutional claim be "clearly established . . . by the

15  Supreme Court of the United States" to be cognizable in a federal habeas proceeding.  28 U.S.C.

16  § 2254(d)(1).  In Estelle v. McGuire, the Supreme Court declined to reach the issue and

17  "express[ed] no opinion on whether a state law would violate the Due Process Clause if it

18  permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."  502

19  U.S. 62, 75 n.5 (1991).  Accordingly, the Ninth Circuit has held that the Supreme Court "has not

20  yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a

21  due process violation sufficient to warrant issuance of the writ."  Holley v. Yarborough, 568 F.3d

22  1091, 1101 (9th Cir. 2009).[6]

23  _____

24  [6] The court notes the Ninth Circuit has not always held this view.  As petitioner points out, in a
    pre-AEDPA case, McKinney v. Rees, 993 F.2d 1378 (9th Cir. 1993), the Ninth Circuit surveyed

25  the laws of the fifty states and historical sources of the common law to conclude: "The rule
    against using character evidence to show behavior in conformity therewith, or propensity, is [a

26  rule] historically grounded" by the "long experience in the common-law tradition, to some extent
    embodied in the Constitution, [that] has crystallized into rules of evidence consistent" with it.  Id.

27  at 1381 (quoting Brinegar v. United States, 338 U.S. 160, 174 (1949)).  The court reasoned that
    the rule against propensity evidence "has persisted since at least 1684 to the present, and is now

28  established not only in the California and federal evidence rules, but in the evidence rules of the

1    In light of the binding authority on point cited by respondent, this court is "therefore

2    without power to issue the writ on the basis" of petitioner's due process claim.  Holley, 568 F.3d

3    at 1101.[7]  Therefore, the undersigned recommends that this portion of petitioner's application for

4    habeas relief be denied.[8]

5    B.  Petitioner's Ineffective Assistance of Counsel Claim

6    Petitioner claims his defense lawyer failed to hire a ballistics expert essential to his

7    defense in violation of his right to effective assistance of counsel.  The Sixth Amendment

8    guarantees criminal defendants the right to the effective "assistance of counsel."  U.S. CONST.

9    amend. VI; see also Strickland v. Washington, 466 U.S. 668, 686 (1984) ("[T]he right to counsel

10   is the right to the effective assistance of counsel.").  Under Strickland, an ineffective assistance of

11   counsel claim has two components: "First, the defendant must show that counsel's performance

12   was [constitutionally] deficient. . . .  Second, the defendant must show that the deficient

13   performance prejudiced the defense."  Strickland, 466 U.S. at 687.  Thus, the "touchstone" of

14   Strickland is reasonableness: (1) counsel's performance fell below the standard for "reasonable

15   representation" under "prevailing professional norms" and (2) there exists "a reasonable

16   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

17   been different."  Roe v. Flores–Ortega, 528 U.S. 470, 482, 489 (2000) (quoting Strickland, 466

18   U.S. at 694).

19   In the habeas corpus context, "[e]stablishing that a state court's application of Strickland

20   was unreasonable under § 2254(d) is all the more difficult.  The standards created by Strickland

---

21   thirty-seven other states and in the common-law precedents of the remaining twelve states and the
22   District of Columbia."  Id. at 1381 & n.2 (collecting sources).  The court affirmed the district
     court's grant of habeas relief based on the admission of prejudicial propensity evidence in
23   violation of due process.  Id. at 1379, 1386.  However, McKinney was decided before AEDPA
     curtailed the scope of federal habeas review.
24   [7] The court notes that "the trial court's admission of" defendant's prior convictions for evading
     the police may very well have "resulted in a trial that was fundamentally unfair and would
25   warrant issuance of the writ under [Ninth Circuit] precedent," Holley, 568 F.3d at 1101 n.2;
     however, the court expresses no opinion on this question.
26   [8] Petitioner also briefly argues the trial court erred by admitting evidence that he was on parole to
27   show motive.  (See Habeas Pet. 22:22-23:20.)  However, since for the reasons discussed above,
     the court lacks the authority to issue habeas relief for due process claims arising from the
28   admission of prejudicial evidence, this claim does not warrant habeas relief either.

1   and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly'

2   so." Harrington v. Richter, 131 S. Ct. 770, 788 (2011) (citations omitted).  Moreover, because the

3   "Strickland standard is a general one," "the range of reasonable applications is substantial."  Id.

4   In short, ineffective assistance habeas claims are subject to two layers of deference, and state

5   courts are granted substantial "leeway" because the Strickland standard is "general."  See

6   Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).

7        Petitioner contends his defense counsel's failure to hire a ballistics expert was

8   unreasonable in light of prevailing professional norms.  Respondent counters that petitioner was

9   not prejudiced, since his own accident-reconstruction expert testified that in his expert opinion

10  Officer Hawkinson was not in harm's way when he fired his gun.  Even so, respondent argues

11  petitioner's counsel's decision to rely on the consultation and testimony of an accident-

12  reconstruction expert rather than a ballistics expert was a tactical decision to which the court

13  should defer.

14       The most forceful portion of petitioner's argument relies on the Ninth Circuit's decision in

15  Duncan v. Ornoski, 528 F.3d 1222 (9th Cir. 2008).  In Duncan, in an opinion by Judge Reinhardt,

16  the Ninth Circuit reversed a district court's denial of a habeas petition, and remanded for issuance

17  of the writ, in a case where the habeas petitioner also claimed counsel was deficient for failing to

18  hire a particular type of expert.  The petitioner in Duncan was convicted of murder, and his

19  defense lawyer decided not to hire a blood expert to analyze blood found at the murder scene.  Id.

20  at 1232.  The defense lawyer explained that the petitioner's fingerprints were found at the scene

21  and that petitioner admitted to him that petitioner was at the murder scene.  Thus, the defense

22  lawyer elected to forgo a blood expert because he was afraid that a blood test would further

23  implicate petitioner.  Id.  A post-conviction blood test revealed strong exculpatory evidence that

24  the blood found at the murder scene did not belong to petitioner nor to the victim, implying the

25  blood belonged to the true killer.  Id. at 1231.  The district court, after an evidentiary hearing,

26  denied habeas relief, and the Ninth Circuit reversed reasoning: "[Petitioner's defense counsel] had

27  [a] duty to consult an expert who could assist him in preparing his cross-examination and serve as

28  an expert witness on [petitioner's] behalf, or [to at least] make an[] effort to establish that the

19

1    blood that came from someone other than the victim did not belong to [petitioner]. [Defense

2    counsel's] inaction was unreasonable, especially given that the blood samples were the only

3    potentially exculpatory evidence in the case." Id. at 1236.

4           However, Duncan is inapposite because it was decided under a different standard.

5    Because the petitioner in Duncan was convicted before AEDPA's enactment, the court in Duncan

6    did not apply AEDPA deference and instead evaluated petitioner's claims de novo. Id. at 1232-

7    33.  Further, in a subsequent case, the Ninth Circuit extended Duncan's reasoning to an AEDPA-

8    deference case and reversed a district court's denial of habeas relief based on defense counsel's

9    failure to hire an expert, in an opinion also authored by Judge Reinhardt, Richter v. Hickman, 578

10   F.3d 944 (9th Cir. 2009) (en banc).  The Supreme Court reversed.  Harrington v. Richter, 131 S.

11   Ct. 770 (2011).  Justice Kennedy writing for the Court started the opinion as follows:

12                    The writ of habeas corpus stands as a safeguard against
                 imprisonment of those held in violation of the law.  Judges must be
13               vigilant and independent in reviewing petitions for the writ, a
                 commitment that entails substantial judicial resources.  Those
14               resources are diminished and misspent, however, and confidence in
                 the writ and the law it vindicates undermined, if there is judicial
15               disregard for the sound and established principles that inform its
                 proper issuance.  That judicial disregard is inherent in the opinion
16               of the Court of Appeals for the Ninth Circuit here under review.
                 The Court of Appeals, in disagreement with the contrary
17               conclusions of the Supreme Court of the State of California and of a
                 United States District Court, ordered habeas corpus relief granted to
18               set aside the conviction of Joshua Richter, respondent here.  This
                 was clear error.
19

20   Id. at 780 (emphasis added).  Since Richter was decided more recently than Duncan and under the

21   AEDPA deference standard applicable to this case, the undersigned declines petitioner's

22   invitation to follow Duncan as persuasive authority, and decides petitioner's claim under Richter.

23          In Richter, as in this case, the petitioner claimed counsel was ineffective for failing to hire

24   a particular expert.  Specifically, petitioner claimed "his counsel was deficient for failing to

25   present expert testimony on serology, pathology, and blood spatter patterns, testimony that, he

26   argued, would disclose the source of the blood pool" at the murder scene.  Id. at 783.  The Ninth

27   Circuit, in a divided en banc opinion, held that the California court's decision rejecting

28   petitioner's Strickland claims was unreasonable under AEDPA.  The Supreme Court reversed,

1   reasoning: "The question is whether there is any reasonable argument that counsel satisfied

2   <u>Strickland</u>'s deferential standard. . . .  <u>Strickland</u>, however, permits counsel to 'make a reasonable

3   decision that makes particular investigations unnecessary.'  It was at least arguable that a

4   reasonable attorney could decide to forgo inquiry into the blood evidence in the circumstances

5   here."  <u>Id.</u> at 788 (citations omitted).  The Court explained:

6          From the perspective of Richter's defense counsel when he was
          preparing Richter's defense, there were any number of hypothetical
7          experts—specialists in psychiatry, psychology, <u>ballistics</u>,
          fingerprints, tire treads, physiology, or numerous other disciplines
8          and subdisciplines—whose insight might possibly have been useful.
          An attorney can avoid activities that appear "distractive from more
9          important duties." <u>Bobby v. Van Hook</u>, 558 U.S. ___, ___, 130 S.
          Ct. 13, 19, 175 L.Ed.2d 255 (2009) (per curiam).  <u>Counsel was</u>
10        <u>entitled to formulate a strategy that was reasonable at the time and</u>
         <u>to balance limited resources in accord with effective trial tactics and</u>
11        <u>strategies</u>.

12   <u>Id.</u> at 789 (emphasis added).  The Court further explained that federal courts evaluating

13   ineffective assistance habeas claims must take into account "strategic considerations": "[C]ourts

14   may not . . . insist counsel confirm every . . . strategic basis for his or her actions.  There is a

15   'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects

16   trial tactics rather than 'sheer neglect.'"  <u>Id.</u> at 790.

17       Here, the California Court of Appeal's decision—that petitioner's defense counsel's

18   failure to hire a ballistics expert did not render his performance unconstitutionally deficient—was

19   not unreasonable because "there is a[] reasonable argument that counsel satisfied <u>Strickland</u>'s

20   deferential standard." <u>Richter</u>, 131 S. Ct. at 788.  In petitioner's criminal trial, petitioner's

21   defense counsel consulted with Laurence Neuman, a civil engineer and accident-reconstruction

22   expert.   Neuman was qualified as an expert and gave his expert opinion—admitted over

23   objection—that Officer Hawkinson was not in danger when he fired the gun.  (<u>See</u> RT 723:28-

24   728:25 ("Q     . . . [I]n your opinion . . . , is [Officer Hawkinson ever at a point where he's going

25   to be hit by [petitioner's] vehicle?     A     From the point where I've drawn forward, no.").)

26   Moreover, defense counsel's cross examination and jury argument reflect a common-sense

27   strategy for the defense, rather than overreliance on ballistics, accident, or bullet-trajectory

28   experts.  (<u>See</u> RT 913:24-914:12 ("We don't need a bunch of experts up her to tell us a bullet

1   travels in a straight line. . . .").)  Although this strategy may not have been ideal, or even

2   advisable, "[i]t was at least arguable that a reasonable attorney could decide to forgo" hiring a

3   ballistics expert, and instead rely on an accident-reconstruction expert, "to balance limited

4   resources in accord with effective trial tactics and strategies."  Richter, 131 S. Ct. at 788-89.

5   Further, as in Richter, petitioner's defense counsel, in her cross examination, "elicited

6   concessions from the State's expert[] and was able to draw attention to weaknesses in [his]

7   conclusions."  Id. at 791.

8          For all these reasons, it would have been reasonable for the California Court of Appeal to

9   find that petitioner had not shown his attorney was deficient under Strickland.  Accordingly

10   petitioner's ineffective assistance of counsel claim does not warrant habeas relief.

11   IV. Conclusion

12          Accordingly, IT IS HEREBY ORDERED THAT the Clerk of Court assign a District

13   Judge to this action, and

14          IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas

15   corpus be DENIED.

16          These findings and recommendations are submitted to the United States District Judge

17   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

18   after being served with these findings and recommendations, any party may file written

19   objections with the court and serve a copy on all parties.  Such a document should be captioned

20   "Objections to Magistrate Judge's Findings and Recommendations."  In his objections petitioner

21   may address whether a certificate of appealability should issue in the event he files an appeal of

22   the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district

23   court must issue or deny a certificate of appealability when it enters a final order adverse to the

24   applicant).  Any reply to the objections shall be served and filed within fourteen days after service

25   of the objections.  The parties are advised that failure to file objections within the specified time

26   ////

27   ////

28   ////

may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  September 26, 2013

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

GP/card0171.hc

23